**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FELICIA JORDAN-KNIGHT, individually and
as Administrator of the Estate of RONALD
JORDON,

          Plaintiff,

  -against-

THE CITY OF NEW YORK,

          Defendants.

Case No.:

**COMPLAINT**

JURY TRIAL DEMANDED

Felicia Jordan-Knight ("Ms. Jordan-Knight" or "Plaintiff"), sister of Ronald Jordon ("Mr. Jordon"), and administrator of the Estate of Ronald Jordon ("the Estate"), by her attorneys, Beldock Levine & Hoffman LLP and Rickner Moskovitz LLP, complaining of the Defendants, alleges, upon information and belief and personal knowledge:

**PRELIMINARY STATEMENT**

1. This civil rights action seeks redress under 42 U.S.C. § 1983 for the injuries and death of the Plaintiff's brother, Ronald Jordon, through the Defendants' unconstitutional and unlawful conduct while he was in the custody of the New York City Department of Corrections ("DOC") at Rikers Island.

2. While at Rikers, Mr. Jordon's leaking wound and edema went untreated and undiagnosed for so long that he required months of hospitalization, antibiotics, a ventilator, a tracheostomy, and a medically induced coma before he eventually died from his injuries.

3. Mr. Jordon's death was caused by a pattern and practice within the DOC, resulting in violations of the constitutional rights of those in DOC custody, and by the deliberate and willful indifference of DOC staff towards the safety and medical needs of individuals in custody.

1

4.  On September 22, 2023, Mr. Jordon died at Fairview Nursing Care Center from injuries he sustained while in DOC custody at Rikers Island.

5.  Shortly upon entering custody, Mr. Jordon—who suffered from mental disabilities including major depressive order, bipolar disorder, schizoaffective disorder, and adjustment disorder, as well as diabetes—was diagnosed with edema in his legs.

6.  Despite the knowledge of his edemas and the pain and side effects he suffered from, including a leaking wound, Defendants failed to treat, diagnose, or otherwise provide sufficient medical care to Mr. Jordon, instead allowing a leg wound to go untreated.

7.  By the time Mr. Jordon received outside medical care, he had developed hypoxia, fever, sepsis with acute renal failure and septic shock due to unspecified organism, an ulcer, and cellulitis, among other things.

8. Mr. Jordon spent months hospitalized at Elmhurst Hospital, where medical professionals attempted to treat Mr. Jordon for his various ailments which developed and progressed exponentially due to the wrongdoing of Defendants.

9.  Despite significant amounts of antibiotics, being placed on a ventilator, an attempt to extubate, receiving a tracheostomy, and being placed in a medically induced coma, Mr. Jordon succumbed to his injuries.

10.  The City of New York, and its agency DOC, have completely lost control of New York City's jails, making Mr. Jordon's death the foreseeable result of their failures.

11.  DOC staff's conduct that caused Mr. Jordon's death is not out of the ordinary at New York City DOC jails, especially for individuals with mental illnesses and other health conditions. In the past several years, there have been numerous deaths due to refusal to provide medical care and adequate supervision.

12. DOC is responsible for the health and safety of people in its care and custody, such as Mr. Jordon. When a person in custody has a medical need, DOC is responsible for protecting them and alerting correction staff and medical staff to their needs.

13. In October 2021, Former DOC Commissioner, Vincent Schiraldi, admitted that Rikers Island has "been at a crisis level for years," adding, "anybody who thinks that things were going well a year ago or two years ago . . . they're living in a dream world."

14. This crisis is not new. In November 2014, Mayor Bill DeBlasio hosted a roundtable to discuss much-needed reforms to Rikers Island, calling the multi-jail complex a "dehumanizing environment" that has been "decades in the making."[1]

15. On April 14, 2022, the City of New York announced, in response to a contempt application, they were not in compliance with a court order mandating that they provide incarcerated individuals adequate medical care, and they claim providing legally mandated medical care is impossible. *Agnew et al. v. The New York City Department of Correction*, 813431/2021E, Dkt. No. 121 (Bx. Co. Sup. Ct. April 14, 2022).

16. Defendants' conduct caused substantial pain and suffering and death to Plaintiff's brother while he was detained at the City of New York's jails on Rikers Island. A pattern and practice within DOC caused Mr. Jordon's injuries, resulting in violations of the constitutional rights of those in DOC custody, and by the deliberate and willful indifference of DOC and HHC staff towards the medical needs of people in their care and custody.

17. Plaintiff seeks an award of compensatory damages, and attorneys' fees.

---

[1] *See* Gloria Pazmino, "De Blasio, with Ponte, Recommits to Rikers Reforms," Politico (November 20, 2014), available at https://www1.nyc.gov/office-of-the-mayor/news/932-14/transcript-mayor-de-blasio-hosts-media-roundtable-reform-rikers-island-correctional

## JURISDICTION & VENUE

18. This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Constitution of the United States.

19. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

20. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

21. Venue is properly laid in the District Court for the Southern District of New York, because the Plaintiff's claims arose in Bronx County.

## JURY DEMAND

22. Plaintiff hereby demands a trial by jury.

## PARTIES

23. Plaintiff Felicia Jordan-Knight is a resident of Roanoke, Virginia.

24. Plaintiff is the administrator of the estate of her brother, the decedent, Ronald Jordon. Plaintiff was appointed as temporary administrator of his Estate on December 13, 2023. The temporary letters of limited administration were extended on July 1, 2024, for six months. Plaintiff received Limited Letters of Administration on December 17, 2024.

25. Mr. Jordon was, at the time of the incident herein, a person detained at Rikers Island in DOC custody.

26. Defendant the City of New York ("the City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a municipal jail system and does so through the DOC, which is responsible for the operation and maintenance of the multi-facility complexes located on Rikers Island.

27. Defendant the City of New York assumes the risks incidental to the maintenance of Rikers Island and the employment of its staff and corrections officers.

4

**STATEMENT OF FACTS**

28. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

29. Mr. Jordon was incarcerated at Rikers Island on or about July 31, 2022.

30. Mr. Jordon had mental disabilities including major depressive disorder, bipolar disorder, schizoaffective disorder, and adjustment disorder.

31. Mr. Jordon also suffered from diabetes.

32. Mr. Jordon developed a serious illness, or illnesses, when he was incarcerated and in the custody and care of DOC.

33. Mr. Jordon was sent to the North Infirmary Command and placed in the care of Defendants soon after he arrived at Rikers Island.

34. While at Rikers Island, Mr. Jordon suffered from lymphedema. Staff at Rikers became aware of his lower extremity edema at least as early as November 2022.

35. Upon information and belief, in March of 2023, Mr. Jordon indicated that he had been experiencing wound drainage on his left leg, which had been wrapped daily.

36. On May 11, 2023, Mr. Jordon was ordered to receive daily wound care for seven days on his left lower leg for a left posterior calf venous stasis ulcer.

37. Multiple medical records from Rikers, including on June 1, 2023, and June 2, 2023, note that Mr. Jordon was to receive wound care for the left posterior calf venous stasis ulcer.

38. The fact that he had an ulcer that was not healing for several weeks should have alerted the staff on Rikers that Mr. Jordan needed far more care than he was able to receive at the North Infirmary Command.

39. Despite awareness of his ailments, the Defendants failed to take Mr. Jordan to a hospital where he could receive the treatment he needed.

5

40. Due to the actions of Defendants, Mr. Jordon's physical condition rapidly deteriorated.

41. While in the care of Defendants, Mr. Jordon's weight skyrocketed, and he developed pneumonia, cellulitis, sepsis, kidney failure, hypoxia, Rhabdomyolysis, and other ailments.

42. Mr. Jordon also became infected with MRSA, and his weight increased significantly while in Defendants' custody.

43. On June 4, 2023, Mr. Jordon's physical condition had reached a point of severity. Mr. Jordon was shivering and urinated on himself. Upon information and belief, the staff nurse consulted urgent care regarding sepsis, and Mr. Jordon was transported from North Infirmary Command at Rikers Island to Elmhurst Hospital in critical condition.

44. At Elmhurst, Mr. Jordon was diagnosed with many ailments, including hypoxia, fever, acute kidney injury, and sepsis with acute renal failure and septic shock due to unspecified organism. He was noted to have a wound to his left lower leg with granulation tissue and white discharge.

45. While at Elmhurst Hospital, Mr. Jordon received a catheter placement and was intubated and placed on a ventilator, which he remained on for multiple weeks.

46. Mr. Jordon's entire body was swollen, as if filled up with fluid, and his enlarged feet appeared green.

47. On June 7, 2023, Mr. Jordon was noted to have significant edema from shoulder to fingers, and his MRSA swab came back positive.

48. Upon information and belief, on June 9, 2023, he went into septic shock and was found to have full body edema.

49. Mr. Jordon had developed a sacral decubitus ulcer – Stage 2, which would require daily dressing changes and being turned every two hours by nurses. The ulcer had overlying black discoloration of the skin.

50. Mr. Jordon began to experience respiratory failure. In response, on June 21, 2023, providers attempted to extubate Mr. Jordon; however, they were unable to do so due to lethargy.

51. On or around June 23, 2023, an EEG showed that Mr. Jordon experienced mild encephalopathy with possible recurrent short-lived seizures.

52. On or around June 30, 2023, after over two weeks of intubation and a failed attempt to extubate, Mr. Jordon received a tracheostomy.

53. Mr. Jordon's wound continued to worsen. It eventually developed into a large necrotic sacral wound with black eschar.

54. Mr. Jordon received a bedside debridement on or around July 21, 2023.

55. Mr. Jordon was given various medications and antibiotics—many in significant doses—at Elmhurst Hospital to help with his ailments.

56. Despite the medications, Mr. Jordon experienced significant pain throughout his hospitalization.

57. While at Elmhurst, Mr. Jordon also received dialysis multiple times a day.

58. For some period of time, Mr. Jordon struggled to communicate with his loved ones.

59. Mr. Jordon was subsequently placed in a medically induced coma at Elmhurst Hospital.

60. Mr. Jordon improved and was conscious following his medically induced coma; however, he eventually succumbed to his injuries.

61. Mr. Jordon died on September 22, 2023, at the Fairview Nursing Care Center in Queens, New York, just after being transferred there. At the time of his death, his sacral wound had reached stage 4 and, upon information and belief, was approximately 15cm-19cm.

**FIRST CLAIM FOR RELIEF:**
***MONELL* CLAIMS AGAINST THE CITY OF NEW YORK**

62. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

63. The City is liable for the conduct of the DOC and its employees on Rikers Island under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

64. The City has had de facto policies of understaffing, failing to hire and train correction officers, failing to properly manage correction officers and staff, and failing to provide adequate medical care to incarcerated individuals at Rikers Island. Furthermore, it has failed to keep Rikers facilities in proper working order.

65. All of the acts and omissions of the Defendants described above were carried out pursuant to overlapping policies and practices of Defendant City and DOC which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the City and DOC.

66. Defendants City and the DOC, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified City and DOC employees' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

67. The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of Mr. Jordon's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

68. The aforementioned customs, practices, procedures, and rules of Defendants and the DOC include, but are not limited to, the following unconstitutional practices:

    i.    Failure to provide adequate medical care for individuals in its custody;

    ii.    Failure to properly train, screen, and supervise employees, and failure to inform supervisors of their need to train, screen, or supervise staff for their deliberate indifference to the serious medical needs of individuals in their custody;

    iii.    Failure to make scheduled visual inspection of cells;

    iv.    Failure to properly observe individuals who are having a medical emergency;

    v.    Failure to ensure patients are produced for their medical appointments;

    vi.    Failure to diagnose and treat worsening medical conditions of those in custody;

    vii.    Failure to timely refer individuals in custody to outside hospitals.

69. The City, including the final policy makers at DOC and the mayor himself, have been aware of problems like those in this Complaint, which have consistently gotten worse since the beginning of the COVID-19 pandemic. Rikers Island continues to deteriorate, and although the final policymakers have known this, they have chosen to do nothing to slow or stop it.

70. This is not a case where a single incident caused the civil rights violation; instead, there are a collection of horrible conditions that have worked in concert to make Rikers unbearable, unconstitutional, and inhumane. These conditions, moreover, have not occurred in isolated facilities or at isolated times. The problem is system wide.

71. The numerous deplorable conditions on Rikers Island add up to create an overall environment that deprives every person incarcerated there of their basic constitutional rights, including Mr. Jordon.

72. Past and current litigation, department reports, and independent investigations have placed the City on notice as to the nature, causes, and persistence of deliberate indifference in the large multi-jail New York City DOC, and specifically at Rikers Island.

73. The problems at Rikers Island specifically are of such a magnitude that the City announced it intends to shut down the whole jail complex. In March of 2017, former Chief Judge Jonathan Lippman and then City Council Speaker Melissa Mark-Viverito stated that "Rikers Island is an affront to the civic values of New York City. Reforming our jail system and closing Rikers Island is not simply good public policy—it is a moral imperative."[2]

74. The New York Commission of Correction in *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* named Rikers Island as one of the five jails that "pose[s] an ongoing risk to the health and safety of staff and inmates and, in instances, impose cruel and inhumane treatment of inmates in violation of their Constitutional rights." The commission found "numerous instances where a death was attributable to deficient medical care, substandard mental health services, or inadequate custody and supervision by security staff."[3]

75. The City has acted with complete and deliberate indifference toward these unconstitutional conditions and the suffering of the detainees forced to endure them, despite years of court-ordered reform, federal monitoring, thousands of individual lawsuits and multiple class actions, and extensive reporting about institutional failures contributing to the shocking conditions at the complex.

---

[2] See Jonathan Lippman and Melissa Marl-Viverito, Closing Rikers Island Is a Moral Imperative, NY Times (Mar. 31, 2017), https://www.nytimes.com/2017/03/31/opinion/closing-rikers-island-is-a-moral-imperative.html.

[3] Thomas Al. Beilein, Chairman of the New York State Commission on Correction, et al. *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State*, New York State Commission on Correction, 2–3 (Feb. 2018), available at https://zh-traditional.scoc.ny.gov/system/files/documents/2023/09/problematic-jails-report-2-2018.pdf.

76. Through its deliberate indifference to the horrible conditions on Rikers Island and its failure to address numerous problems there despite being aware of them for many years, the City has violated Plaintiff's rights and caused injury. As a result, the City of New York is liable for any damages caused.

**A. Routine, Emergency, and Preventative Medical Care is Unavailable.**

77. For years, DOC's mismanagement of Rikers has caused the delay and denial of medical care to inmates on the Island—in November 2018, 21% of inmates who needed specialty medical services were not produced to on-island specialty clinics.[4] That number increased to 30-33% in November 2019 and 2020[5][6], and leapt to a shocking 53% in November 2021.[7] Productions to mental health appointments were similarly dismal. Between November 2018 and November 2021, 19-35% of mental health appointments were missed because correctional officers did not escort and/or produce inmates to mental health services.[8]

78. More recently, the percentage of non-productions to medical appointments has risen significantly due to worsening staffing problems and mismanagement. The denial and delay of medical care have been directly attributed to the problem of improper staffing and absenteeism.

---

[4] *See* Correctional Health Services, CHS Access Report: November 2018 (January 29, 2019), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/CHS_Access_Report_Nov_2018_v2.pdf.

[5] *See* Correctional Health Services, CHS Access Report: November 2019 (February 25, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/chs-access-report-q4cy19.pdf.

[6] *See* Correctional Health Services, CHS Access Report: November 2020 (August 31, 2021), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/chs-access-report-cy20q4.pdf.

[7] *See* Correctional Health Services, CHS Access Report: November 2021 (February 7, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/Correctional-Health-Authority-Reports/CHS-Access-Report-CY21Q4.pdf.

[8] Jan Ransom and William K. Rashbaum, "How Brutal Beatings on Rickers Island were Hidden From Public View," The New York Times (March 2, 2022), available at https://www.nytimes.com/2022/03/02/nyregion/nyc-jail-beating-rikers.html.

According to former DOC Commissioner Vincent Schiraldi, inadequate staff was the sole reason for missed medical appointments.[9] Jeanette Merrill, a spokesperson for Correctional Health Services ("CHS"), similarly expressed that "[t]he department's staffing shortages are affecting health operations, including the availability of escorts to bring patients to the clinic and of DOC personnel to staff the clinics. In response to this shortage, as we've prioritized critical services to highest risk patients in response to availability of DOC resources, the number of patients awaiting less critical care has grown."[10]

79. Even when detainees have managed to schedule medical appointments, they are unable to attend them because correctional officers do not escort them through the facility to the medical unit. Where escorts are not available, individuals in detention are simply unable to access routine as well as emergency health services.

80. As a result, detainees have missed thousands of medical visits, and the percentage of non-productions has risen significantly.

81. On May 13, 2022, Bronx Supreme Judge Taylor found the DOC in contempt of a December 2021 court order directing DOC to provide access to sick call and to not prohibit or delay access to health services.[11] In December 2021 alone, 1,061 medical appointments were missed because of a lack of officer escorts.

82. In addition, detainees have been denied emergency medical services. In a letter dated

---

[9] Jacob Kaye, "Detainees Continue to Miss Medical Appointments, DOC Official Says," The Queens Eagle (Feb. 1, 2022), https://queenseagle.com/all/detainees-continue-to-miss-medical-appointments-doc-official-says?rq=Detainees%20Continue%20to%20Miss%20Medical%20Appointments%2C%20DOC%20Official%20Says%2C.

[10] *Darnell v. Pineiro*, 849 F.3d 17, 32 (2d Cir. 2017).

[11] *See Agnew et al v. New York City Dep't of Corr.*, Index No. 813431/2021E (Sup. Ct. Bronx Co. 2021), NYSCEF Dkt. No. 126.

September 10, 2021, Dr. Ross MacDonald, the Chief Medical Officer of CHS, stated that the "[u]navailability of staff has resulted in delays in transferring patients to clinics for care, to mental health units, or to the hospital, even when 911 has been activated and EMS has arrived to transport them."[12] These significant delays functionally amount to a complete denial of emergency medical care.

83.    One detainee was forced to wait over two months before receiving medical attention for scabies—an itchy condition caused by mites that is very easy to transfer to other people—despite repeated requests to see a doctor for weeks. Another man was made to wait for six weeks for treatment after his fingers were badly jammed; by the time he was seen by the medical staff, his fingers were permanently twisted.[13]

84.    Delays in accessing medical care have heightened the risk of serious, lasting physical injury as well as self-harm. George Anderson, a mental health administrator for CHS, said that "with such long wait times for medical care—sometimes weeks, where it was once days—there is now greater incentive for detainees to self-harm in order to be seen."[14]

85.    The deliberate indifference that caused Mr. Jordon's death is not out of the ordinary at Rikers, especially for individuals with mental illnesses and other health conditions. Rather, a pattern and practice of deliberate indifference exists. Several entities, including the United States Attorney's Office for the Southern District of New York, the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, the New York Times, and

---

[12]MacDonald Letter (September 10, 2021), available at https://www.ny1.com/content/dam/News/static/nyc/pdfs/RM-city-council-letter-9-10-21.pdf.
[13] *See* Rachel Sherman, "Rikers Staffing Crisis Limits Access to Medical Care," The City (Aug. 26, 2021), available at https://www.thecity.nyc/health/2021/8/26/22643199/rikers-staffing-crisis-medical-care.
[14] *Id.*

the Associated Press have conducted major investigations, which have revealed patterns of abuse

and neglect by DOC staff on Rikers Island. In the past several years, there have been numerous

brutal deaths due to refusal to provide medical care and supervision. For example:

   i. Nicholas Feliciano attempted to commit suicide by hanging at a Rikers in November 2019 and sustained a serious brain injury. Correction officers watched him hanging for over 7 minutes. The City paid $28.75 million to settle the related lawsuits.[15]

   ii. Layleen Cubilette-Polanco died on June 7, 2019. Ms. Polanco died from an epileptic seizure at Rikers. She had been placed in solitary confinement, and corrections officers, who were supposed to check on her every 15 minutes, neglected to check on her for periods of up to 57 minutes. The City paid $5.9 million to settle a lawsuit regarding her death.[16]

   iii. Casey Holloway died at Rikers Island on July 9, 2018 after another person in DOC custody attacked him in the Mental Observation Unit where the two were housed. Mr. Holloway, who had asthma, struggled to breathe following the attack and collapsed, but he was not immediately taken to an infirmary or otherwise given medical attention and died later that day. The City settled a lawsuit regarding his death. *Holloway v. City of New York, et al.*, 1:19-cv-8344 (S.D.N.Y.).

   iv. Joseph Foster died on December 30, 2017 in DOC custody from a brain hemorrhage. Mr. Foster was screaming in agony in his cell and begging for a doctor, but a jail captain took close to an hour to move Mr. Foster to the medical clinic.

   v. Angel Perez-Rios died on January 24, 2016 at Rikers Island. Mr. Perez-Rios repeatedly begged for stronger psychiatric medication to treat his mental health condition, but his appointments were cancelled. Mr. Perez-Rios was found hanging from his cell window by a noose made of shoelaces.

   vi. Richard Gonzalez died in October 2015 in a holding cell at Rikers Island after gasping for air and convulsing on the floor. Captain Henry and others correction officers near the holding cell ignored his pleas for help and 90 minutes passed with no officer calling for medical help. The City settled a lawsuit regarding his death. *Carlson et al. v. City of New York et al.*, 17 Civ.172 (PAE) (S.D.N.Y.).

   vii. Christian Haley died on October 23, 2014 in the custody of the DOC. He died

---

[15] Ransom, J., & Tiefenthäler, A. (2024, April 6). *New York City set to pay a record $28 million to settle Rikers Island Suit*. The New York Times. https://www.nytimes.com/2024/04/06/nyregion/nyc-rikers-negligence-lawsuit.html

[16] *Polanco v. City of New York*, 19-cv-4623 (S.D.N.Y.) (filed November 15, 2019); https://www.nytimes.com/2020/08/31/nyregion/layleen-polanco-settlement-rikers-transgender.html. Seventeen corrections officers, including one captain, were disciplined for their role in the tragedy; yet only four were suspended without pay. https://www.nytimes.com/2020/06/26/nyregion/layleen-polanco-rikers-transgender-death.html?action=click&module=RelatedLinks&pgtype=Article

as a result of being transferred to a facility where his medical needs could not be met. See, *Fernandez, Gertrudys et al. v. City of New York, et al.*, 17 Civ. 2431 (GHW)(SN) (SDNY).

viii. Victor Woods died on October 21, 2014 at Rikers. He was hemorrhaging internally. A DOC officer, while sipping from a coffee cup, watched this unfold. Mr. Woods then bled to death. The City settled a lawsuit regarding his death for $1.5 million.[17]

ix. Jerome Murdough, a homeless veteran, died on February 15, 2014 in a mental health unit at Rikers. He was locked in a 101- degree cell for hours. DOC officers ignored his pleas for help. The City paid $2.25 million to settle the lawsuit regarding his death.[18] A guard plead guilty on 2016 to falsifying business records to state that she had checked on Mr. Murdough.

x. Rolando Perez died in January 2014 at Rikers Island after suffering multiple seizures. He was put in solitary confinement without clearance from medical staff. Mr. Perez required seizure medication to control his seizure disorder. In solitary, Mr. Perez was screaming for his anti-seizure medication for his seizure disorder but was ignored. The City settled a lawsuit regarding his death.[19]

86. The foregoing incidences and the civil litigation arising from them have put the City and DOC on notice that the failure to monitor the individuals in their care and supervise, train, and discipline staff create a significant risk of death or serious injury.

87. The DOC has in general failed to implement proper procedures to ensure individuals at Rikers receive medical attention. To the extent certain policies are in place, the DOC has failed to properly supervise and train officers to respond to medical needs.

88. In 2021 alone, 16 people died in custody.[20] These deaths have been described as "jail-attributable" by Dr. Ross MacDonald, meaning that that jail conditions meaningfully contributed

---

[17] Jake Pearson, *Widespread Problems on Rikers Island Tough to Finally* Fix, Washington Post (Dec. 28, 2014), available at https://www.washingtonpost.com/politics/widespread-problems-on-rikers-island-tough-to-finally-fix/2014/12/28/b2a92e6c-8d2c-11e4-a085-34e9b9f09a58_story.html

[18] Justin Worland, *$2.5 Million Settlement for Hot Jail Cell Death on Rikers Island*, Time (Oct. 31, 2014), available at https://time.com/3551713/rikers-hot-jail-cell-death-settlement/.

[19] Paula Mejia, *City Pays $3.5 Million to Family of Man Who Was Allegedly Denied Epilepsy Meds at Rikers*, Gothamist (May 1, 2019), available at https://gothamist.com/news/city-pays-35-million-to-family-of-man-who-was-allegedly-denied-epilepsy-meds-at-rikers.

[20] *See* Michael Wilson and Chelsea Marcius, "16 Men Died in New York City Jails Last Year. Who Were They?" (January 28, 2022), available at https://www.nytimes.com/2022/01/28/nyregion/rikers-island-prisoner-deaths.html.

to each death.[21]

89. MacDonald cited "breakdowns in basic functions such as failing to provide correctional staff to supervise some housing areas or observe incarcerated people placed on suicide watch" as contributing factors to these deaths. Ross MacDonald further stated in his letter that "we have witnessed a collapse in basic jail operations, such that today I do not believe the City is capable of safely managing the custody of those it is charged with incarcerating in its jails[.]"

90.  In 2025, fifteen people died in custody at Rikers.[22]

91.  This month, two people died at Rikers within 24 hours of each other, bringing the death count at Rikers in 2026 to four as of May 2026.[23]

92.  The DOC does not even deny that lack of staffing has severely limited access to required medical care. In a filing in *Agnew, et al. v. New York City Department of Correction*, Index No. 813431/2021E, the DOC admitted that:

> Respondent [the DOC] does not dispute the applicability of the mandates and has freely acknowledged deficiencies in its ability to escort individuals in custody to clinic appointments, primarily due to lack of staff in the jails. … There is no real dispute between the parties as to the following facts: DOC is required to provide access to medical care for individuals in its custody, and the inability to consistently do so is due to serious staff shortages related to the pandemic.

93.  A reasonable fear of violence among detainees is exacerbated by the Island's proven failure to adequately respond to injuries. According to a report by the Board of Corrections into the DOC's responsibility for deaths in custody, "<u>DOC and CHS do not seem to have an acceptably</u>

---

[21] *See* MacDonald Letter (September 10, 2021), available at
https://www.ny1.com/content/dam/News/static/nyc/pdfs/RM-city-council-letter-9-10-21.pdf.
[22] Nazish Dholakia, Erica Bryant, Sam McCann, and Benjamin Heller, "Tracking Deaths in NYC Jails Since 2022" (May 19, 2026), available at https://www.vera.org/news/nyc-jail-deaths.
[23] *See* Ed Shanahan, "2 Die at Troubled Rikers Jail Complex in 24 Hours" (May 29, 2026), available at https://www.nytimes.com/2026/05/19/nyregion/rikers-deaths-inmates.html.

functioning system for providing emergency care to persons in life-threatening situations."[24] (emphasis added). In two separate cases, the Board of Corrections found that there were delays in providing emergency medical care to people experiencing fatal medical emergencies.[25] In both instances, only one officer was stationed in the control unit bubble, when two are supposed to be.[26]

94.  Given the pervasive failures to take injured people for medical treatment, it is likely many more required hospitalizations. The DOC has a pattern and practice of underreporting serious injuries.[27]

**B.  The Defendant City continues to neglect Rikers' physical deterioration in anticipation of its closure.**

95.  Structural deterioration is another long-standing issue on the Island, as the City has ceased any meaningful maintenance of the grounds in anticipation of closing Rikers altogether.

96.  Less than two years after the *Nunez* Consent Judgment, the City announced a $30 million comprehensive plan to close and replace Rikers.[28] City officials claimed that the plan included "immediate steps to expand services and renovate facilities to ensure that those who work and are incarcerated in city jails have safe, humane conditions as quickly as possible."[29]

---

[24] NYC Board of Correction February & March 2022 Deaths in DOC Custody Reports and Recommendations, May 9, 2022, pg. 7, available at https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/deaths-report-and-chs-response-202202-202203.pdf
[25] *Id.*
[26] *Id.*
[27] NYC Board of Correction Serious Injury Reports in NYC Jails, January 2019, available at https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2019.01.07%20-%20BOC%20Serious%20Injury%20Report%20-%20Final.pdf
[28] "Mayor de Blasio Announces 'Smaller, Safer, Fairer: A Roadmap to Closing Rikers Island,'" Fortune Society, available at https://fortunesociety.org/media_center/mayor-de-blasio-announces-smaller-safer-fairer-roadmap-closing-rikers-island/
[29] *Id.*

97.  While the plan made clear that the transition away from Rikers would be lengthy (at the time, the estimated year of completion was 2026), it did not provide a detailed account of how those who remained housed on Rikers Island for the remainder of its operational period would be provided with constitutional standards of care. And in 2015, Mayor de Blasio admitted that he underestimated how dysfunctional Rikers is and how much was required to fix it.[30]

98.  In the months and years that followed the decision to close Rikers, the Island's eight separate jail facilities have fallen into complete disrepair. The problem is so abysmal that the City does not even have the ability to execute and complete routine work orders.[31]

99.  The City has long been on notice of these conditions; their own investigation in 2015 found scores of "'raw materials to fashion weapons,' with buildings full of aging pipes, metal radiators and other items that could be broken, beaten or carved into crude blades."[32] One detainee recently discovered that a metal grate in the wall of his cell was deteriorated so significantly that he was able to easily kick it down, climb out, and stab his neighbor.

100. The structural deterioration at Rikers contributes to the physical and mental deterioration of incarcerated people. One detainee attributed numerous suicide attempts to the "complete isolation, extreme temperatures, polluted air, [and] the stink of the landfill" that is the

---

[30] *See* Michael Winerip, "Even as Many Eyes Watch, Brutality at Rikers Island Persists," The New York Times (Feb. 21, 2015) https://www.nytimes.com/2015/02/22/nyregion/even-as-many-eyes-watch-brutality-at-rikers-island-persists.html.

[31] *See* Nicole N. Austin, "Report on Environmental Conditions: *Benjamin v. Brann*, 75 Civ. 3073 (LAP) Progress Report May-August 2021," Office of Compliance Consultants (October 27, 2021) at 30 ("As with the prior monitoring period, a review of the PHS and EHO inspection reports for the current monitoring period indicate numerous references to the lighting not being maintained, and where work orders have been submitted the conditions have remained unabated, necessitating the submission of additional work orders.")

[32] *See Liam* Stack, "2 Rikers Guards Set Up Attack on Inmate, Officials Say," The New York Times (Sept. 17, 2015), available at https://www.nytimes.com/2015/09/18/nyregion/2-rikers-guards-set-up-attack-on-inmate-officials-say.html

ever-present reality of being incarcerated at Rikers.[33] This physical and mental deterioration is exacerbated by the lack of emergency and preventative care resulting from staffing shortages.

101. The City's deliberate indifference to structural deterioration has persisted for years, leaving past, present, and future detainees vulnerable to illness, injury, and/or death.

102. Whistleblowers and activists, along with City and State officials, have warned for years that the Island was at a breaking point, long before COVID-19 reached New York. Yet Rikers has so greatly deteriorated that local politicians have pled with Gov. Hochul and President Biden to intervene, even requesting that the federal government send in the National Guard to help restore some semblance of order. Zachary Carter, former NYC Corporation Counsel and former US Attorney for New York's Eastern District, supported the idea of a federal receivership.[34]

103. When people incarcerated at Rikers are forced to remain in these deteriorating conditions and in crowded, unsanitary, uninhabitable cells, the overall environment created results in gross rights violations.

104. The conditions leave detainees vulnerable to illnesses like COVID-19 and legionnaires disease. Again, these conditions reinforce each other: the crowded and unsanitary conditions lead to rampant illness, left untreated because of staffing shortages and general mismanagement of facilities and services.

105. Crowded, unsanitary, and uninhabitable conditions are pervasive throughout all facilities and experienced in one form or another by all people incarcerated at Rikers.

---

[33] *See* Raven Rakia, "A sinking jail: The environmental disaster that is Rikers Island," Grist (March 15, 2016), available at https://grist.org/justice/a-sinking-jail-the-environmental-disaster-that-is-rikers-island/.

[34] *See* "Reformers Call for Federal Takeover of New Yorks Rikers Jail," The Fortune Society, https://fortunesociety.org/media_center/reformers-call-for-federal-takeover-of-new-yorks-rikers-jail/.

106. In summary, through its deliberate indifference to the horrible conditions on Rikers Island and its failure to address numerous problems there despite being aware of them for many years, the City has violated Plaintiff's rights and caused injury. As a result, the City of New York is liable for any damages caused.

WHEREFORE, Plaintiff demands the following relief jointly and severally against the City of New York:

    a.    Compensatory damages;

    b.    The convening and empaneling of a jury to consider the merits of the claims herein;

    c.    Costs and interest and attorney's fees;

    d.    Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
      May 29, 2026

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, 26th Floor/PH Suite
New York, New York 10016

By: _____
    David B. Rankin
    M. Olivia Clark
    (212) 277-5883
    drankin@blhny.com
    oclark@blhny.com

RICKNER MOSKOVITZ LLP
14 Wall Street, Suite 4C
New York, New York 10005

By: ____/s/ Rob Rickner_____
    Rob Rickner
    (212) 300-6506
    Rob@RMCivilRights.com